# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                                           **CR No. 99-447 JP**

**JIMMY A. RAPHAELITO,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

On May 20, 1999, Defendant Raphaelito filed a Motion to Suppress Physical Evidence (Doc. No. 8). At a July 29, 1999, hearing, I ruled that the law enforcement officers' entry into the trailer to arrest Defendant on the night of August 5, 1998, was justified by the existence of exigent circumstances. I also ruled that the law enforcement officers' search of the trailer on August 6, 1998, was lawful because the victim, Elaine Martine, had the authority to consent to the search of the trailer and gave that consent to law enforcement officers. I reserved ruling on the lawfulness of the August 5, 1998, search of the trailer until the parties had briefed the issue of the legality of law enforcement officers arresting Defendant, removing Defendant from the premises, and then returning to the unlit trailer with flashlights to search for evidence the victim had described as being present in the trailer. Having reviewed the post-suppression briefs and the applicable law, I conclude that Defendant's Motion to Suppress should be granted in part and the evidence seized from Defendant's trailer on August 5, 1998, should be suppressed.

# FACTS

At the hearing, four witnesses testified for the Government. Their testimony established the following facts.

On August 5, 1998, Elaine Martine's mother took her to Pine Hill Clinic on the Ramah Navajo Reservation. Ms. Martine had bruises, cuts, and cigarette burns on her body. Officer Charley spoke with Ms. Martine, who said that she had been assaulted by Defendant at the trailer home where she and the Defendant lived together. (Tr. at 22.)

Later in the evening, after dark, four officers approached the Defendant's unlit trailer home on foot. (Tr. at 94-95.) After the officers heard someone snoring, (Tr. at 31), they entered the trailer through the front door, which opens into the living room. (Tr. at 66.) Because the officers had heard the sounds of snoring coming from the master bedroom, the officers then turned to their right and entered the master bedroom where Defendant lay sleeping on the bed. (Tr. at 66.) Only one of the four officers, Lieutenant Chimaco Eriacho of the Ramah Navajo Police Department, testified at the hearing.

Lieutenant Eriacho testified that because there is no electric power in the trailer, the officers used flashlights when they entered the trailer. (Tr. at 104.) He also testified that after the Defendant had been arrested, removed from the trailer, and placed in the patrol car, the officers reentered the trailer and used flashlights to "comb[ ] from one place to the other . . they sort of swept slowly going into the bedroom" looking for evidence Ms. Martine had described as being in the trailer. (Tr. at 105-106.) The officers also took pictures as they looked for evidence. (Tr. at 106.)

At the hearing, FBI Special Agent Carlos Zamora testified that the physical evidence

seized by the officers during the post-arrest search of the trailer on August 5, 1998, included those pieces of evidence listed on Government's Exhibit 9, "Ramah Navajo Police Department Evidence Recovery Log" with the initials "KC" written beside them. (Tr. at 35.) This included the following: Item 2 (black T-shirt); Item 3 (knife); Item 5 (Reebok tennis shoe); Item 8 (Fila Tennis Shoe); Item 9 (black jeans or pants); Item 10 (black T-shirt); Item 11 (bra); Item 13 (panty); Item 14 (Mickey's liquor); and Item 17 (burnt match sticks).[1] (Tr. at 35-36.) The officers seized these ten pieces of evidence from the master bedroom and the living room of the trailer. A diagram of the trailer and the location of the seized evidence shows that all of the evidence, with the exception of a beer can in Defendant's bathroom, was in areas of the trailer through which the officers had to pass as they entered and exited the trailer to arrest Defendant and take him outside. (Diagram of Trailer, Government's Exhibit 5.)

I ruled at the hearing that the items listed on Government's Exhibit 9 with the initials "KC" written adjacent to their item number "were not observed in plain view by the law enforcement officers until, and were not observed by them through the use of flashlights until after they had already taken the Defendant into custody and removed him from the trailer." (Tr. at 111.)

---

[1] At the hearing, I denied Defendant's motion to suppress all of the other evidence listed on Government's Exhibit 9.

**DISCUSSION**

In the Government's post-suppression hearing brief, it argues that the agents' post-arrest warrantless search and seizure of evidence from Defendant's trailer the night of August 5, 1998, was lawful under the exigent circumstances and plain view doctrines. The Government also contends that even if exigent circumstances did not justify the post-arrest warrantless search and seizure of evidence, the police were authorized under the search incident to arrest doctrine to search the area that had been within the "wingspan" of Defendant at the time of his arrest.

**Exigent Circumstances and Plain View Doctrines**

A search and seizure that occurs inside a home without a warrant is presumptively unreasonable. *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). "When the police [ ] seek to enter a home without a warrant, the government bears the burden of proving that sufficient exigency exists." *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996), *cert. denied,* 520 U.S. 1149 (1997). Exigent circumstances refers to "imminent danger of death or serious bodily harm, imminent danger of destruction of important property, response to an emergency, or hot pursuit of a fleeing felon." *United States v. Gonzales*, 763 F.2d 1127, 1132 n.5 (10th Cir. 1985). Whether the Government satisfied its burden of demonstrating that exigent circumstances existed depends on the unique facts of each case. *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir.), *cert. denied*, 510 U.S. 1026 (1993).

The plain view doctrine allows an officer to seize evidence without a warrant when (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the object's "incriminating character" is "immediately apparent," and (3) the officer has "a lawful right of access to the object itself." *Horton v.*

*California*, 496 U.S. 128, 136-37 (1990) (internal quotations and citation omitted).  Although the Defendant asserts that the plain view doctrine only applies when the discovery of evidence is inadvertent, that is no longer the law.  *See Horton*, 110 S.Ct. at 2304, 2308 (eliminating inadvertence requirement of plurality in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)).

Here, the Government argues that the officers' concern that other victims may have been present in the trailer constituted an exigent circumstance that justified the officers' post-arrest reentry and search of the trailer.  *See Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims . . . on the premises.").

At the hearing, I ruled that "exigent circumstances existed permitting the law enforcement officers to make a lawful entry for the purpose of [ ] taking the Defendant into custody on the evening of August 5, 1998."  (Tr. at 109.)  I based this ruling on my finding that "there was no resident prosecutor or judge,"available to issue a warrant within a reasonable amount of time, that Lieutenant Eriacho believed it was necessary to immediately arrest the Defendant because of his history of violence and the nature of his attack on Ms. Martine, and that the officers did not know whether other victims were in the trailer.  (Tr. at 108.)  Once the officers had arrested the Defendant and removed him from the trailer, their justification for

searching the trailer without a warrant was to look for other victims.[2]  Although the Government asserts that this is what the officers did, the testimony at the hearing contradicts this assertion.

Lieutenant Eriacho testified that the officers thought there might have been other victims in the trailer, (Tr. at 97), but neither Lieutenant Eriacho nor anyone else testified whether the officers were concerned about the presence of other victims only *before* the officers' entered into the trailer to arrest Defendant or also *after* the officers had arrested Defendant and removed him from the trailer.  In the absence of this evidence, and in light of the other evidence presented at the hearing, the Government's contention that the officers were concerned about other possible victims being present in the trailer after arresting the Defendant is simply not credible.  By the time the officers later searched the trailer and seized the evidence at issue here, the officers had already entered the trailer through the front door; walked through the living room to the master bedroom to reach the bed where Defendant lay sleeping; arrested the Defendant; and walked back outside through the master bedroom and the living room to the front entrance.  Had there been any victims in the living room or the master bedroom, the officers almost certainly would have discovered them during their initial entry and exit.

The Government's assertion that the officers were concerned about the possibility of other victims when they reentered and searched the trailer is belied by Lieutenant Ericaho's testimony and the limited scope of the post-arrest search.  Lieutenant Ericaho testified that the officers

---

[2] The Government did not argue that it was concerned that other individuals might enter the Defendant's trailer and remove or disturb evidence before the officers could obtain a search warrant.  Nor was there any testimony presented at the hearing that the officers were concerned that they would be unable to secure Defendant's trailer before procuring a search warrant.  Nor does the Government argue that the officers searched the trailer after Defendant's arrest as part of a protective sweep to look for other assailants. (Government's Post-Suppression Hearing Brief at 2.)

6

"combed from one place to the other and they, well, according to the information what Elaine mentioned, that a shirt and shoes and bra and electrical cord, and this and that, they sort of swept slowly going into the bedroom." (Tr. at 105-06.) Lieutenant Ericaho also testified that the officers "took pictures as they go along." (Tr. at 106.) According to Lieutenant Eriacho's testimony, then, the officers' search of the trailer after Defendant's arrest was for the purpose of seizing evidence Ms. Martine had described as being there--not for the purpose of searching for any other victims.

This conclusion is buttressed by the narrow scope of the officers' post-arrest warrantless search. Based on Lieutenant Eriacho's testimony and the location of the evidence seized the night of August 5, 1998, which was exclusively from the master bedroom, the bathroom of the master bedroom, and the living room, it appears that the officers' post-arrest search of the trailer was confined to the master bedroom and the living room. (Evidence Recovery Log, Government's Exhibit 5; Tr. at 105-06.) Had the officers truly been concerned about the possibility of other victims in the trailer, they would have searched the entire trailer, which had other rooms, rather than just the master bedroom and bathroom and the living room. Moreover, it would not make sense for the officers to be concerned about the presence of other victims in the living room and master bedroom because the officers had already walked through these rooms in the process of arresting Defendant and removing him from the trailer. Obviously, the Government's claim that the officers searched the trailer out of a concern for victims is a mere pretext for the real reason they searched the trailer--to search for evidence they expected to be there. *See United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987) ("The Government's claim that they believed exigent circumstances were present smacks of pure unadulterated pretext.")

7

Therefore, I now make the specific factual finding that the officers searched the trailer after Defendant had been arrested and removed from the trailer for the sole purpose of seizing evidence described by Ms. Martine.

This finding distinguishes this case from those cited by the Government, which all involve searches of residence for the purpose of determining whether assailants, victims, or unattended children remained in the home. *See, e.g., United States v. Salava*, 978 F.2d 320, 324-25 (7th Cir. 1992) (initial search of Defendant's trailer for approximately one minute to look for shooting victims was justified by exigent circumstances although Defendant apprehended outside trailer); *United States v. Mason*, 966 F.2d 1488, 1492-93 (D.C. Cir. 1991) (a five to ten minute sweep of an apartment for assailants or victims was justified by exigent circumstances), *cert. denied*, 506 U.S. 1040 (1992); *Sallie v. State of North Carolina*, 587 F.2d 636, 641 (4th Cir. 1978) (exigent circumstances justified officer's search of trailer for unattended children and plain view doctrine justified taking photos of interior of trailer when officer reported to homicide call), *cert. denied*, 441 U.S. 911 (1979). Moreover, *Salava* and *Mason* involved searches of no more than ten minutes while the officers' search of Defendant's trailer in this case must have lasted much longer than a mere ten minutes.[3] *Sallie* is also of limited persuasive value because that case involved a prisoner's habeas corpus petition alleging ineffective assistance of counsel on several grounds, including the failure of defendant's trial counsel to object to the validity of the officer's search of

---

[3] The testimony at the hearing established that the four officers arrived at the trailer by foot at approximately 11:04 P.M. on August 5, 1998. (Tr. at 44.) The officers left the trailer at approximately 12:39 A.M. on August 6, 1998. Thus, the officers were at the trailer for approximately an hour and a half. Because it could not have taken ninety minutes to arrest the Defendant and remove him from the trailer, it is clear that the officers' search of the trailer, which also involved the taking of numerous photographs, took much longer than ten minutes and was probably closer to an hour.

8

defendant's trailer home.

Based on my finding that the officers' searched the trailer for evidence instead of victims, I conclude that the Government has failed to meet its burden of establishing that exigent circumstances justified the officers' post-arrest reentry and warrantless search of the trailer. Because the officers did not have a warrant to search the trailer and because at that time there were no exigent circumstances justifying the search, the officers were not at a lawful vantage point when they saw the evidence in plain view after arresting Defendant.[4]

I note that the plain view doctrine would have applied to the officers' initial entry into the trailer for the purpose of arresting Defendant. Because exigent circumstances existed then, the officers were at a lawful vantage point and could have seized whatever incriminating objects were in plain view. Unfortunately, however, the Government did not call any witness to testify about what evidence the officers' may have seen in plain view during the process of arresting Defendant and removing him from the trailer. Although I am practically certain that at least some of the evidence was in plain view during the time the officers were in the trailer arresting Defendant, I obviously cannot speculate as to what the officers actually saw. Therefore, I have no choice but to conclude that the Government failed to meet its burden of showing what items the officers saw in plain view while they were lawfully inside the trailer for the purpose of arresting the Defendant. This forecloses a finding that the plain view doctrine justified the officers' seizure of evidence on

---

[4] It is beyond dispute that the use of flashlights does not render moot the plain view doctrine. *See, e.g., United States v. Dunn*, 480 U.S. 294, 305 (1987) (use of a flashlight to illuminate interior of barn door "did not transform [law enforcement officers'] observations into an unreasonable search within the meaning of the Fourth Amendment."). That, however, is not the issue presented here. Instead, the issue is whether exigent circumstances justified the officers' presence in Defendant's trailer after they had arrested him and had placed him in a patrol car.

the evening of August 5, 1998.

## Search Incident to Arrest Doctrine

Under the search incident to arrest doctrine, "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons" and to "seize any evidence on the arrestee's person." *Chimel v. California*, 395 U.S. 752, 763 (1969). "[T]he area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." *Id*. Whether a defendant is hand-cuffed at the time of the search and seizure is only one factor to consider when determining whether an area searched is within the arrestee's immediate control. *Parra*, 2 F.3d at 1066.

The Government argues that the seizure of the knife, two beer cans, and burnt matches, which were either on Defendant's bed or in the bed's immediate vicinity, "were clearly within the 'wingspan' of Raphaelito and could permissibly be seized incident to Raphaelito's arrest," even though the Defendant had already been hand-cuffed. (Government's Post-Suppression Hearing Brief at 3.) The Government does not assert that the knife, beer cans, and matches were actually seized at the time of Defendant's arrest, and, in fact, no witness testified that any evidence was seized at the time of Defendant's arrest. It seems that the Government is arguing that because these items of evidence were in the area within Defendant's immediate control at the time of his arrest, the officers were justified in seizing this evidence even *after* they had arrested the Defendant and placed him in a patrol car.

This argument is clearly frivolous. Once the Defendant was hand-cuffed, taken outside the trailer, and placed in the patrol car, the Defendant's bed and the area surrounding it obviously was not within his immediate control. *See Bonitz*, 826 F.2d at 956 (holding that search and

seizure of weapon after defendant had been hand-cuffed and placed in custody did not fall under the search incident to arrest doctrine because the search was not conducted to disarm defendant or to ensure officer safety). The purpose of the search incident to arrest doctrine is to ensure officer safety, prevent the defendant from escaping, and to prevent the concealment and destruction of evidence, *Chimel*, 395 U.S. at 763, not to allow the Government to rationalize the actions of law enforcement officers after they have violated an arrestee's Fourth Amendment rights. As I have already discussed, it is unfortunate that the Government did not call any witnesses who might have been able to testify about what evidence was seen or seized in the course of arresting Defendant, but I cannot rectify that omission by applying the search incident to arrest doctrine when it is so clearly inapplicable.

IT IS THEREFORE ORDERED that Defendant Raphaelito's Motion to Suppress Physical Evidence (Doc. No. 8) is GRANTED in part; the law enforcement officers' post-arrest warrantless search of the trailer on August 5, 1998, was unlawful because the Government failed to meet its burden of establishing that exigent circumstances existed at the time of the search and because the search incident to arrest doctrine is inapplicable; all physical evidence seized during the August 5, 1998, search of the Defendant's trailer is suppressed.

_____
UNITED STATES DISTRICT JUDGE